**COMMONWEALTH of Pennsylvania,**
**Appellee,**

v.

**Christopher DISTEFANO, Appellant.**

Superior Court of Pennsylvania.

Argued March 15, 2001.
Filed Aug. 16, 2001.
Reargument Denied Oct. 17, 2001.

Gerard M. Karam, Scranton, for appellant.

Eugene M. Talerico, Jr., Asst. Dist. Atty., Scranton, for Commonwealth, appellee.

Before: CAVANAUGH, HUDOCK and HESTER, JJ.

CAVANAUGH, J.

¶ 1 Christopher DiStefano appeals from the judgment of sentence of from fifteen to forty years incarceration imposed after he was convicted, non-jury, of third-degree murder.[1] We vacate the judgment of sentence.

1. Appellant was charged with first-degree murder, second-degree murder, third-degree murder, robbery and theft. He filed a Writ of Habeas Corpus claiming that no *prima facie* case against him had been made out at the preliminary hearing. The trial court granted

¶ 2 Prior to a lengthy trial, appellant filed a motion to suppress his confession which was denied. Appellant's chief contention on appeal is that the court erred in denying his motion to suppress.

The standard when this court reviews a suppression motion is that we must first determine whether the factual findings are supported by the record, and then determine whether the inferences and legal conclusions drawn from those findings are reasonable. *Commonwealth v. Hall*, 549 Pa. 269, 701 A.2d 190 (1997). We may consider the evidence of the witnesses offered by the prosecution, as verdict winner, and only so much of the defense evidence that remains uncontradicted when read in the context of the record as a whole. *Id.* at 197. We are bound by facts supported by the record and may reverse only if the legal conclusions reached by the court below were erroneous. *Id.*

*Commonwealth v. Luv*, 557 Pa. 570, 735 A.2d 87, 90 (1999).

¶ 3 The pertinent facts are that the nude body of Christine Burgerhoff, a twenty-four year old prostitute, was found in the parking lot of Allied Food Corporation on Keyser Avenue in Scranton at approximately 11:00 a.m. on April 6, 1996. Subsequent investigation led the authorities to believe she had been killed by ligature strangulation late on the night of April 5th at her place of employment, The Reflex Center, a house of prostitution masquerading as a massage parlor.

¶ 4 Appellant was a former high-school boyfriend of the victim. He was interviewed by police three times regarding his relationship with her. The third interview, conducted in the Dunmore barracks, began at 7:00 p.m. on April 10th and concluded with appellant's signing a written confession to the murder at 6:00 a.m. on April 11th. Appellant was not advised of his *Miranda* rights until after the confession had been attained and he had been formally arrested. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

¶ 5 Appellant was in a 15′ × 15′ room in the exclusive company of police officers during the entirety of the eleven hour interrogation which resulted in his confession, except for bathroom breaks and three brief breaks in the questioning during which appellant was left unattended. Appellant's car keys were taken away from him for the purposes of conducting a consensual search of his vehicle and were not returned.

¶ 6 During the interrogation, appellant was asked to provide a speculative theory of the circumstances of the homicide. He surmised that the victim was visited by a former lover at her place of employment who became enraged and killed her when she rejected his romantic advances. When asked what concerns the hypothetical third person killer might have, appellant replied that the killer would be worried about being treated fairly and about receiving psychological help. The interrogating officer, Trooper Joseph Pacifico, answered these concerns with assurances that the hypothetical killer would be treated fairly under the law and would receive mental health services. Appellant asked the trooper to put the assurances in writing. The trooper asked appellant "What should I write?" The following note was pre-

---

partial relief, dismissing the charges of second-degree murder, robbery and theft. We affirmed the dismissal of those charges at the Commonwealth's interlocutory appeal. The charges of first-degree and third-degree mur-

der remained. In exchange for DiStefano's waiver of his right to trial by jury, the Commonwealth agreed that the charges rose no higher than third-degree murder.

pared at the appellant's direction, appellant dictating and the trooper writing:

> We understand you're not a murderer—that it was a crime of passion—that you have a lot of pain, grief and remorse inside. That we intend to give you the necessary treatment to relieve your pain, grief and remorse.
>
> TPR Joseph G. Pacifico [signature]

¶ 7 Appellant then asked Trooper Pacifico to write "We do not intend to prosecute you." The trooper's report of the interview reveals that he declined the suggestion, telling appellant that:

> I could not promise **HIM** (DISTEFANO) that because eventually **HE** would be arrested and the Court could then order treatment to help him.

¶ 8 Detective Carlson joined Trooper Pacifico in the interrogation room at approximately 1:00 a.m. and the interrogation subsequently became accusatory and confrontational as they told appellant that they believed "the guy in his [hypothetical] scenario was him." At approximately 3:00 a.m. appellant asked if he could leave and return to continue the questioning the next day and was told "no" and that "you know, listen you're here now, you know. Why don't we just talk about this, get this all wrapped up. Something to that effect." The questioning continued and the interrogation report reveals that approximately one hour later:

> Det. CARLSON and I asked DISTEFANO what he was worried about or afraid of that he couldn't tell us the truth. DISTEFANO said he wanted to finish his semester at college and wanted to get his teaching certificate. He said if he was arrested he wouldn't be able to finish his school semester. He also said that if he were convicted of a crime like this he would never get his teaching certificate. We discussed his concerns about school and told him he would eventually be able to finish his schooling and get his teaching certificate.

¶ 9 At approximately 4:00 a.m., appellant agreed to "tell the truth" and a written statement of confession was taken in the presence of three officers. The statement included a narrative of the events as told by appellant followed by police questions and appellant's answers thereto. At 6:07 a.m., appellant was formally placed under arrest and given his rights under *Miranda*.

¶ 10 The suppression court reasoned that appellant was not in custody during the interrogation so that no *Miranda* rights attached until after formal arrest. The suppression court also determined that the statement was voluntary and that the police made no promises to appellant designed to induce him to confess. We disagree with both findings.

■ ¶ 11 In *Miranda*, the United States Supreme Court held that a confession given during custodial interrogation is presumptively involuntary, unless the accused is first advised of his right against self-incrimination. *Id.*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Miranda* warnings are not required where the interrogation is not custodial. *Commonwealth v. Nester*, 551 Pa. 157, 709 A.2d 879, 882 n. 4 (1998) (citations omitted). "A person is in custody for the purposes of a custodial interrogation when he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation." *Id.* (citation omitted). Police detentions become custodial when under the totality of the circumstances the conditions and/or duration of the detention become so coercive as to become the functional equivalent of arrest. *Common-*

*wealth v. Busch,* 713 A.2d 97, 100 (Pa.Super.1998) (citing *Commonwealth v. Ellis,* 379 Pa.Super. 337, 549 A.2d 1323 (1988)).

Among the factors the court utilizes in determining, under the totality of the circumstances, whether the detention became so coercive as to constitute the functional equivalent of arrest are: the basis for the detention; the location; whether the suspect was transported against his will; how far, and why; whether restraints were used; the show, threat or use of force; and the methods of investigation used to confirm or dispel suspicions.

*Busch,* 713 A.2d at 101 (quoting *Commonwealth v. Peters,* 434 Pa.Super. 268, 642 A.2d 1126, 1130 (1994) (*en banc*)).

¶ 12 The suppression court found that appellant was not subjected to a custodial interrogation for the following reasons: 1) at one point during the interrogation, after the tone of the interview had turned accusatory and confrontational, one of the officers told appellant that if he was not going to tell the truth, he might as well leave; 2) appellant was twice told that he was not under arrest; 3) appellant came to the barracks voluntarily; 4) appellant was not hand-cuffed or isolated in a holding area; 5) appellant was given beverages and bathroom breaks; 6) the door to the interview room was closed but not locked; and 7) appellant did not himself believe he was in custody because at one point he asked if he could leave.

¶ 13 We find that the court's determination was error based on a consideration of the totality of the circumstances as follows: The subject interrogation was admittedly designed to elicit an incriminating response. The detention occurred in the police barracks. Appellant was detained for eleven hours overnight. The only persons appellant saw during that time were police officers. The interview turned confrontational and accusatory five hours before its conclusion with the police telling appellant that they believed he was the perpetrator and that they did not believe his denials. The crime under investigation was murder. Appellant's vehicle keys were taken from him and were not returned. At approximately 3:00 a.m., appellant expressed a desire to leave and was told "no. You know, you're here. If you're going to tell us, tell us." Accordingly, we find that the police action physically and psychologically deprived appellant's freedom of movement and choice in a significant way and constituted a custodial interrogation.

▮▮▮ ¶ 14 With respect to the suppression court's rationale for concluding that the interrogation was non-custodial, it is clear that an interrogation may be custodial in nature even where the accused has been advised he is not under arrest during questioning and where he voluntarily appears at the interview at the request of the police. *Commonwealth v. Brown,* 473 Pa. 562, 375 A.2d 1260, 1265 (1977). Further, when appellant was advised he could leave if he wasn't going to tell the truth, the police were in control of appellant's vehicle, and as a practical matter, he could not leave. Significantly, the record is clear that at an earlier point during the interrogation, appellant expressly asked to leave, but was told "no."

▮▮▮ ¶ 15 Based on the foregoing, we find that the conditions and duration of the detention were the functional equivalent of arrest in that appellant reasonably believed his freedom of movement was restricted. We conclude that the interrogation was custodial in nature and that appellant's resulting confession was given in violation of his Fifth Amendment rights

under *Miranda.*[2]

¶ 16 We additionally find error in the suppression court's conclusion that appellant's confession was voluntary under the totality of the circumstances and not the result of manipulation, improper promises or the exertion of improper influence.

When deciding a motion to suppress a confession, the touchstone inquiry is whether the confession was voluntary. Voluntariness is determined from a totality of the circumstances surrounding the confession. The question of voluntariness is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess. The Commonwealth has the burden to proving by a preponderance of the evidence that the defendant confessed voluntarily.

...When assessing the voluntariness pursuant to the totality of the circumstances, a court should look at the following factors: the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand suggestion and coercion.

*Commonwealth v. Nester,* 551 Pa. 157, 709 A.2d 879, 882–83 (1998) (citations and footnotes omitted).

¶ 17 The suppression court concluded that the promises made by the police to appellant had no nexus to the confession. The court found that there was no strict *quid pro quo* offered by the police. The court opined "The nature of the assurance was not 'If you confess to this crime, we will work things out so that you can finish your schooling.'" We disagree with the court's conclusion.

¶ 18 The record shows that the police implied that appellant would get help for his psychological needs by court order only after he was arrested. The clear implication was that appellant would not be formally arrested until he "told the truth" and admitted that he was the person in the hypothetical scenario. When appellant said that he was concerned he would never be able to finish his degree and get his teaching certificate if he was arrested and convicted of the subject crime, the police falsely assured him that such was not the case. These assurances were made during

2. We disagree with the suppression court's alternative suggestion that to the extent *Miranda* rights attached prior to formal arrest, appellant knowingly waived them because he had experience as a security guard and told the police approximately half-way through the interrogation that he "knew his rights."

Before an individual may be subjected to custodial interrogation, he or she must make a knowing and intelligent waiver of his or her privilege against self-incrimination and right to counsel after adequate warning of those rights. *Commonwealth v. Williams,* 539 Pa. 61, 650 A.2d 420 (1994); *Commonwealth v. Chacko,* 500 Pa. 571, 459 A.2d 311 (1983). The test for determining whether a waiver is knowing and voluntary is multi-faceted. In order to determine the voluntariness of a waiver, we must ascertain whether the waiver was the result of an intentional choice that was not subjected to undue governmental pressure. *Commonwealth v. Cephas,* 361 Pa.Super. 160, 522 A.2d 63 (1987). To determine whether the waiver was knowing and intelligent, we focus upon the defendant's cognitive processes, i.e., whether the defendant was aware of the nature of the choice that he made in relinquishing his *Miranda* rights. *Id.* *Commonwealth v. Ellis,* 700 A.2d 948, 950 (Pa.Super.1997). It is clear that appellant was not given an adequate warning of his *Miranda* rights in the first instance and the record does not support a showing that appellant undertook to waive them.

an eleven hour overnight interview without the benefit of *Miranda* warnings to a person whose car keys had been taken and who was told he could not go when he asked to leave. Under a totality of the circumstances we conclude that the confession was not voluntarily given. We find that the interrogation was clearly manipulative and resulted in a confession which was not made freely or by unconstrained decision. Accordingly, we find that appellant's confession should have been suppressed.

¶ 19 We move now to appellant's claim that the evidence was insufficient to sustain the verdict of third-degree murder. Our standard of review upon a challenge to the sufficiency of the evidence is well-settled:

"The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt." *Commonwealth v. Heberling,* 451 Pa.Super. 119, 678 A.2d 794, 795 (Pa.Super.1996) (citing *Commonwealth v. Williams,* 539 Pa. 61, 650 A.2d 420 (1994)). In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. *Commonwealth v. Cassidy,* 447 Pa.Super. 192, 668 A.2d 1143, 1144 (Pa.Super.1995) (citations omitted). The Commonwealth

may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence. *Commonwealth v. Valette,* 531 Pa. 384, 388, 613 A.2d 548, 549 (1992) (citations and quotation marks omitted).

*Commonwealth v. Hennigan,* 753 A.2d 245, 253 (Pa.Super.2000) (quoting *Commonwealth v. Vetrini,* 734 A.2d 404, 406–407 (Pa.Super.1999)).

¶ 20 The Pennsylvania Criminal Code defines third degree murder as any killing with malice that is not first or second degree murder. *See generally* 18 Pa.C.S.A. § 2502(c). Decisional precedent further establishes that third degree murder requires no specific intent to kill. *Commonwealth v. Baskerville,* 452 Pa.Super. 82, 681 A.2d 195, 199–200 (1996) (citing *Commonwealth v. Seibert,* 424 Pa.Super. 242, 622 A.2d 361, 364 (1993)). Rather, the *mens rea* for third degree murder is malice, the definition of which is well settled:

Malice consists of a "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.... ["] [M]alice may be found where the defendant consciously disregarded an unjustified and extremely high risk that his actions might cause serious bodily injury.

*Commonwealth v. Cottam,* 420 Pa.Super. 311, 616 A.2d 988, 1004 (1992) (citations omitted). We have carefully reviewed the entire undiminished record in this matter

and are persuaded that the evidence presented at trial was sufficient to allow the finder of fact to conclude that all the elements of third degree murder were proven beyond a reasonable doubt.

¶ 21 Appellant also claims entitlement to discharge on the basis of a Rule 1100 (now Pa.R.Crim.P. 600) violation. Because appellant was incarcerated during the pendency of pre-trial proceedings, he was required to be tried within 180 days of arrest. Subtracting all excludable time from computation, including the time required to dispose of appellant's complex pre-trial motions and the Commonwealth's *Dugger* certified interlocutory appeal[3], appellant was brought to trial five days late. The issue raised is controlled by *Commonwealth v. Oliver*, 449 Pa.Super. 456, 674 A.2d 287 (1996) which held that the only remedy for a Rule 1100 violation in a capital-offense case is permitting the accused to petition for an immediate trial. The instant case involved the possible imposition of capital punishment until the day of trial when through agreement, the charge was amended to include only third-degree murder. DiStefano filed no petition for immediate trial prior thereto and there is no remedy available to him at this juncture.

¶ 22 Given our disposition of appellant's chief issues, we need not address appellant's remaining claims on appeal but briefly discuss his challenge to the admissibility of certain trial evidence as it may affect re-trial. Appellant claims that evidence in his diary and journal showing his proclivity for engaging in auto-erotic, oxygen-deprivation masturbatory techniques as well as the accoutrements necessary to perform such sexual acts found in his home and car should have been suppressed as prejudicial and irrelevant. We disagree.

¶ 23 It is clear the victim died as a result of asphyxia through ligature strangulation. Appellant engaged in sexually-oriented oxygen-deprivation techniques with himself and other willing partners. The performance of these sexual acts involved, among other things, constriction of the airway through ropes, belts, or tape tied around the neck.

¶ 24 The admissibility of evidence is a matter within the sound discretion of the trial court and will be reversed only where there is a clear abuse of discretion. *Commonwealth v. Weber*, 549 Pa. 430, 701 A.2d 531, 534 (1997) (citing *Commonwealth v. Johnson*, 536 Pa. 153, 638 A.2d 940, 942 (1994)). Evidence is admissible if, and only if, it is relevant. *Commonwealth v. Petroll*, 696 A.2d 817, 833 (Pa.Super.1997) (citing *Commonwealth v. West*, 440 Pa.Super. 575, 656 A.2d 519, 521 (1995)). Evidence is relevant and, therefore, admissible if it logically tends to establish a material fact in the case, if it tends to make a fact at issue more or less probable, or if it supports a reasonable inference or presumption regarding the existence of a material fact. *Commonwealth v. Bronshtein*, 547 Pa. 460, 691 A.2d 907, 917 (1997) (citing *Commonwealth v. LaCava*, 542 Pa. 160, 666 A.2d 221, 227–28 (1995)).

¶ 25 The central fact at issue in appellant's trial was whether or not he was the killer of Mrs. Burgerhoff who was murdered by ligature strangulation. That appellant had, in the past, frequently used neck bindings and ligatures of various types to deprive himself and others of oxygen in the pursuit of heightened sexual pleasure was relevant in that it supported

**3.** *Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382 (1985).

reasonable inferences regarding a fact at issue.

¶ 26 Appellant claims the evidence was inflammatory and that its prejudicial effect outweighed its probative value. We disagree. "Of course, most of the evidence offered by the prosecution in a criminal case will prejudice the defendant." *Commonwealth v. Enders*, 407 Pa.Super. 201, 595 A.2d 600, 603 (1991) (citation omitted). "The inquiry, therefore, is whether the evidence is so prejudicial that it 'may inflame' the jury to make a decision based on 'something other than the legal propositions relevant to the case.'" *Id.* at 603–04 (citations and emphasis omitted). Our review of the record discloses that the evidence presented was not so prejudicial as to inflame the passions of the fact-finder to make a decision of guilt or innocence based on appellant's admittedly aberrant sexual practices instead of conducting a proper inquiry regarding whether or not the facts presented were proof of appellant's culpability with respect to the crimes charged beyond a reasonable doubt.

¶ 27 In conclusion, we find that the court erred in denying appellant's motion to suppress his confession. The confession was given in violation of appellant's rights under *Miranda* and was not voluntary.

¶ 28 The judgment of sentence is vacated. Case remanded. Jurisdiction is relinquished.